Harry J. Stevens, Inc. v. Commissioner.
Harry J. Stevens, Inc. v. Commissioner
Docket No. 16196.
United States Tax Court
1949 Tax Ct. Memo LEXIS 203; 8 T.C.M. (CCH) 388; T.C.M. (RIA) 49098; April 28, 1949
Harry J. Stevens, Jr., Esq., for the petitioner. John E. Mahoney, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of deficiencies for the year 1944 in income tax and declared value excess-profits tax in the amounts of $1,344.51 and $582.45, respectively. The only issue is whether respondent erred in disallowing a deduction of $4,106.75, claimed by petitioner to represent a debt which became worthless during the taxable year. Findings of Fact Petitioner, a New Jersey corporation with principal office at 478 Central Avenue, Newark, New Jersey, filed its corporation income and declared value excess-profits tax return for the taxable year with the collector of internal revenue for the fifth *204 district of New Jersey. Petitioner keeps its books and prepares its returns on an accrual basis. Petitioner is engaged in the operation of a real estate and insurance agency. Except for a few qualifying shares, all of its stock is owned by Harry J. Stevens, hereinafter called Stevens. During the years 1939 and 1940, prior to petitioner's creation, Stevens operated the agency as a sole proprietorship. During the year 1939 and for about 20 years previously he employed his brother, Arthur J. Stevens, hereinafter called Arthur, as a real estate salesman. In particular, Arthur was in charge of all sales of property of the Home Owners' Loan Corporation made through Stevens' office. In that capacity, Arthur was authorized to receive from purchasers deposits upon the purchase price of property. He held such deposits as agent for Stevens, and was obligated to turn the money over to Stevens. If the sale for which a certain deposit had been made was carried through to completion, Stevens would customarily pay to Home Owners' Loan Corporation, hereinafter called Home Owners, the amount of the deposit. If, on the other hand, the prospective purchaser chose to withdraw before the sale was completed, *205 Stevens would customarily return to him the amount of his deposit. In the latter part of the year 1939 Stevens discovered that Arthur had received some deposits for which he had failed to account. At that time an investigation was made, and Arthur stated that he had withheld an aggregate of $3,246.50. On January 5, 1940, Arthur and his wife, Lillian, executed and delivered to Stevens a joint promissory note for $1,623.35 (one-half the admitted defalcation), payable on January 5, 1941, to the order of Stevens. At about the same time cash in the amount of $1,623.25 was received by Stevens from Amanda Widmer, Arthur's sister-in-law, in payment of the remaining one-half of the defalcation. Subsequently, in the year 1940, it was discovered that the aggregate amount of deposits withheld was $5,730, instead of the $3,246.50 originally admitted. Arthur orally promised to pay Stevens $4,106.75, representing the net amount misappropriated after subtracting the $1,623.35 cash payment from Amanda Widmer. No further written instruments were executed. Neither Arthur nor Lillian has made any payment on their joint promissory note. Arthur admitted ownership of a diamond ring and a life insurance *206 policy with a paid-in equity of about $600, both of which were pledged to secure loans to Arthur from other persons. If he owned any other assets, Stevens did not know of them. Stevens sought the advice of lawyers, including his nephew, concerning the possibilities of bringing legal proceedings against Arthur to recover at least part of the deposits, but decided against it because he believed they would have little chance of success. At the time the irregularities in accounts were discovered, Stevens believed Arthur would continue working for him as a salesman and that over a period of time he would make good the losses. Prior to January 1, 1944, Stevens had paid from his own earnings $4,106.75, the net amount of Arthur's defalcations after subtracting the $1,623.25 received from Amanda Widmer. The $4,106.75, above, was disbursed by Stevens in payments to Home Owners and to prospective purchasers, the payments being made to meet Stevens' obligations arising out of the receipt by Arthur as his agent, of the subsequently misappropriated deposits described above. These payments were not deducted by either Stevens or petitioner in their returns for years prior to the taxable year. *207 At various times during the years 1941, 1942, and 1943, Arthur offered Stevens amounts of about $5 and $10 as payments on account, but these were refused for the reason that Stevens preferred to wait until anticipated real estate deals were closed which were expected to result in large commissions for Arthur. In the year 1942 Arthur left the employ of Stevens to work as salesman for Nutley Mortgage Company, hereinafter called Nutley, a New Jersey concern. At about that time Stevens conferred with an official of Nutley, named Bickel, who was optimistic concerning Arthur's earning capacity. In particular, Bickel orally agreed to inform Stevens as commissions were earned by Arthur and before they were paid to him. One commission from Nutley of about $4,000 was anticipated. However, Bickel died at an undisclosed date prior to January 1, 1944, and petitioner was never informed of Arthur's earnings at Nutley. During the years 1942 and 1943, Arthur lived rent-free in a house in Milburn, New Jersey, owned by Stevens. On April 10, 1944, Arthur pleaded not guilty to charges of embezzling $170 during the year 1943 from Nutley, two indictments containing the charges having been returned *208 on March 31, 1944, by the Grand Jury for the County of Essex, New Jersey, at its December, 1943, term. On January 15, 1945, he retracted his former plea and pleaded non vult. On January 31, 1945, he was sentenced to eighteen months in the county penitentiary; but the sentence was suspended and he was placed upon probation for five years upon condition that he pay twenty-five cents weekly during that period to the Chief Probation Officer. Just prior to the indictments, Arthur had ceased working for Nutley and had moved to California. He still lives in California. Upon the return of the indictments in the year 1944 Stevens believed Arthur would eventually plead guilty, that his career as a salesman was over, and that all hopes of recovering anything from him were lost. As of about December, 1941, petitioner was organized to take over Stevens' business, and certain assets of the sole proprietorship were transferred to petitioner. On the books of the sole proprietorship, the amounts paid to Home Owners or to prospective purchasers to replace the deposits misappropriated by Arthur had been recorded as debits. Those debit entries, in the aggregate amount of $5,730, were made during *209 the period beginning December 18, 1939, and ending December 22, 1940. In the same account credit entries in the aggregate amount of $4,073.25 were made during the period beginning January 6, 1940, and ending April 1, 1940. The following entry was made on petitioner's books in June, 1942: Dr.
Cr.
$5,370.00
Arthur J. Stevens
A. J. Stevens
$1,623.25
Harry J. Stevens
2,450.00
Trustee Account,
H.J.S., Inc.
1,656.75 In the above entry, the $5,730 represented Arthur's total defalcations, the $1,623.25 represented the payment received from Amanda Widmer, the $2,450 represented the total cash payments made by Stevens from his own funds, and the $1,656.75 represented commissions due, which were applied to complete payment of Arthur's defalcations. In the year 1944 petitioner charged its above account to profit and loss. On line 24 of its return for the taxable year petitioner deducted the amount of $4,106.75 with the accompanying explanation: "Uncollectible Account." In his notice of deficiency respondent determined - "* * * that you are not entitled to a deduction of $4,106.75 on account of an obligation which you state became uncollectible during *210 the taxable year 1944." Opinion We never reach the fundamental issue of the propriety of petitioner's treatment as a bad debt of the item in controversy because of petitioner's failure to show any basis for the debt in its hands. That necessity is conceded by petitioner, it being acknowledged in its brief that "In order to establish this account as a bad debt in the hands of petitioner, it is necessary to establish its cost basis since petitioner is a transferee of the debt." See Elmore Milling Co., 27 B.T.A. 84, 92, affirmed (C.A.D.C.), 70 Fed. (2d) 736. There is no contention of an actual cost to petitioner, and apparently none with respect to any tax-free transaction referred to in section 112. Petitioner's position is based solely on the contention that within the meaning of section 113(a)(8)(B) petitioner acquired the debt "as paid-in surplus or as a contribution to capital," thereby succeeding to the transferor's cost. There is no direct evidence that this indebtedness was ever acquired by petitioner at all. If there was a bill of sale or other instrument transferring the property of the sole proprietorship, it does not appear in the record. *211 We are unable to tell from any such document what the transferred assets were. The only record of this debt on petitioner's books was made months after the transfer of the business. And the fact is, as petitioner recognizes in its brief, that "the debt is partially evidenced by a promise to pay in the form of a note of the defalcator." That note is in evidence. It is made to the order of the individual who formerly operated the business. But it is not endorsed even in blank and nothing in connection with the instrument indicates that it was ever negotiated or assigned by him to anyone. However that may be, and even assuming that the debt was transferred, there is a complete absence of any showing that it was acquired as paid-in surplus or as a contribution to capital. The evidence, in fact, indicates the contrary. The only book entry appearing in the record shows a credit representing the balance of the account in favor of the transferor, petitioner's sole stockholder. This is the exact reverse of any demonstration that petitioner received the benefit of the property. Not only is there no corresponding credit to paid-in surplus or to capital as would be required to give these accounts *212 the benefit of the contribution in question, see, e.g., Saliers "Accountants' Handbook," 283, but the credit to the account of the stockholder [1] imports an indebtedness due him from petitioner, a concept diametrically inconsistent with that of capital or paid-in surplus. Harry T. Nicolai, 42 B.T.A. 899, affirmed (C.C.A., 9th Cir.), 126 Fed. (2d) 927. The result is a failure of proof of the facts necessary to support the only contention on which petitioner relies to justify a basis of its own. The deficiency must accordingly be sustained. Decision will be entered for the respondent. Footnotes
1. Petitioner's accountant testified: "* * * This went to the credit of Harry J. Stevens on the corporation's books which the ledger account shows. "Q. Was this applied to the surplus account? "A. No, this went to the credit of Harry J. Stevens. "Q. By 'this,' I mean the entries on Exhibit 3. Were they in the surplus account? "A. These latter two that you see here went to the credit of Harry J. Stevens on the corporation's books because he put up the money and there they stood." * * *↩